**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**NORTHERN DIVISION**
**CASE NO.:**

| | | |
|---|---|---|
| KHRISTA SIMMONS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORTHAMPTON COUNTY BOARD OF EDUCATION; | ) | |
| | ) | |
| PAMELA CHAMBLEE, Superintendent of Northampton County Schools, in her individual capacity; | ) | **COMPLAINT** |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## PRELIMINARY STATEMENT

1.    Khrista Simmons files this complaint against the Northampton County Board of Education (hereinafter "Board") for Discrimination and Retaliation in violation of Title II of Americans with Disabilities Act (ADA) of 1990, § 202, 42 U.S.C. § 12132; Interference and Retaliation in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. 2601, *et seq*.; and Negligent Infliction of Emotional Distress ("NIED").

1

2. The Board, by and through persons acting under color of state law, violated Ms. Simmons's statutory rights to be free from discrimination and retaliation on the basis of her disability as well as free from interference and retaliation for taking protected medical leave.

3. Ms. Simmons was injured and is entitled to recover damages caused by Defendants' violation of her federal statutory rights and NIED in accordance with North Carolina state law.

4. Superintendent Chamblee, in her individual capacity, negligently inflicted emotional distress on Ms. Simmons.

5. Ms. Simmons was injured and is entitled to recover damages caused by Defendants' violation of her statutory rights, as well as Dr. Chamblee's negligent infliction of emotional distress.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

7. Plaintiff brings this action to redress deprivation of Plaintiff's rights under Title II of Americans with Disabilities Act (ADA) of 1990, § 202, 42 U.S.C. § 12132; and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. 2601, *et al* and North Carolina state law.

8. This Court has supplemental jurisdiction over North Carolina state law claims pursuant to 28 U.S.C. § 1367.

9. Venue is proper pursuant to 28 U.S.C. § 1391(b), because Defendants are located within the Eastern District of North Carolina, and a substantial part of the acts or omissions giving rise to this complaint arose from events occurring within this judicial district.

10. Local Boards of Education are separate corporate bodies that can sue and be sued. N.C. Gen. Stat. § 115C-40.

## WAIVER OF GOVERNMENTAL IMMUNITY

11. Upon information and belief, the Defendant School Board contracted with the North Carolina School Boards Insurance Trust (NCSBT), which then contracted with a commercial carrier, Great American Insurance Company, to provide excess liability insurance coverage to the Defendant School Board. By obtaining this insurance coverage, the School Board has waived its governmental immunity for claims between $150,000.00 and $1,400,000.00.

12. Plaintiff alleges that her actual and compensatory damages in this action are in excess of $150,000.00.

## WAIVER OF PUBLIC OFFICIAL IMMUNITY

13. Public employees are not entitled to immunity from negligence claims and may be liable for negligent acts personally committed during the course of his or her professional duties. *See Isenhour v. Hutto*, 350 N.C. 601, 611 (1999); *see also Reid v. Roberts*, 112 N.C. App. 222,224,435 S.E.2d 116, 119 (1993).

14. "Public officials may be liable for negligence if their actions were "corrupt or malicious, or that [they] acted outside of or beyond the scope of [their] duties." *Smith v. Hefner*, 235 N.C. 1, 7 (1952); *see also Grad v. Kaasa*, 312 N.C. 310,313,321 S.E.2d 888, 890 (1984) ("A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another.").

15. "Where [a] duty is absolute, certain, and imperative, involving merely the execution of a set task—in other words, is simply ministerial—[the defendant] is liable in damages to any one specially injured, either by his [or her] omitting to perform the task, or by performing it negligently or unskillfully." *Moffitt v. Davis*, 205 N.C. 565, 172 S.E. 317, 318 (1934)

## PARTIES TO THE COMPLAINT

16. PLAINTIFF Khrista Simmons was, and at all relevant times and at the time of the events complained of herein, a Principal in Northampton County Schools (NCS) and employed by the Board.

17. DEFENDANT Board is, and at all relevant times hereto was, a body politic and local board of education, as that term is defined in North Carolina General Statute Section 115C, in Northampton County.

18. DEFENDANT Superintendent Chamblee ("Dr. Chamblee") was, and at all relevant times hereto was, Superintendent of Northampton County Schools, as that term is defined in in North Carolina General Statute Section 115C-5(8).

4

Dr. Chamblee was suspended from her position by the State Board of Education on December 2, 2021.

## FACTUAL ALLEGATIONS

19. Ms. Simmons is a person with a disability. She has been diagnosed with lupus, generalized anxiety disorder, fibromyalgia, and recurrent major depressive disorder. Ms. Simmons's diagnoses were well known to Defendant Board, and she had previously taken medical leave in 2018.

20. In previous years, Defendant Board allowed Ms. Simmons to take necessary medical leave to address her underlying conditions without fear of retaliation.

21. However, Defendants' response to Ms. Simmons's medical conditions changed under the leadership of Dr. Chamblee.

22. Superintendent Chamblee was at all relevant times the Superintendent of the NCS, an agent of the Board.

23. Ms. Simmons was Principal at Gaston Elementary School (hereinafter "GES") from July 2020 to April 2021, until she was assigned to teach third grade in May 2021.

24. Ms. Simmons's duties as Principal included: chief administrator in the school in charge developing and implementing policies, programs, curriculum activities, and budgets in a manner that promotes the educational development of each student and the professional development of each staff member; supervising all school personnel; and reporting to the superintendent.

25. During the COVID-19 global pandemic, the Board's schools provided remote instruction for many of its students.

26. According to the 2019 U.S. Census, only 52.9% of households in Northampton County had a broadband internet subscription.[1]

27. Due to the limited resources of the Board and the student population it serves, the Board allowed multiple options for students to receive instruction and credit for coursework completed during the 2020-21 academic year.

28. The Board trained its administrators on the options available during remote learning that were designed to ensure all students received instructional materials and were graded appropriately, and without prejudice due to their lack of access to the internet.

29. At the training, due to students' lack of access to the internet, the Board informed administrators it was waiving the requirement of participating in remote instruction and would allow students to be marked present and complete assignments in one of two ways: 1) attending online courses, filling out a Google form for attendance, and completing online assignments; or 2) completing paperwork packets sent home and being marked present once the school received the completed work packet.

---

[1]Northampton County, North Carolina, United States Census Bureau, https://www.census.gov/quickfacts/fact/table/northamptoncountynorthcarolina,NC/PST045219 (Last accessed December 13, 2021).

30.     Ms. Simmons worked diligently to ensure online remote instruction was provided and paperwork packets, along with student meals, were sent home to students every week.

31.     Ms. Simmons also organized buses to pick up the paperwork packets from students unable to access online instruction and created a designated drop box for parents to submit the paperwork packets during and outside of school hours.

32.     In addition, Ms. Simmons coordinated with her teachers and the school social worker to identify students who were either not logging in to virtual instruction or not turning in paperwork packets. Ms. Simmons directed the school social worker reach out to families and visit those students' homes to ensure compliance with the Board's policy on instruction during COVID.

33.     Ms. Simmons was diagnosed with COVID on September 11, 2020. Ms. Simmons worked from home every day during her quarantine except the afternoon of October 1, 2020, due to the severity of her symptoms.

34.     Ms. Simmons returned to work in person on October 5, 2020, and timely submitted her leave form for October 1, 2020.

35.     On October 15, 2020, Ms. Simmons received an email from Dr. Chamblee harassing Ms. Simmons about taking a half-day of leave on October 1, 2020, and accusing Ms. Simmons of not providing administrative coverage for her school, despite the fact that another administrator, Mr. Barfield, was assigned to cover her school while Ms. Simmons was working remotely due to contracting COVID.

36. Ms. Simmons reminded Dr. Chamblee of Mr. Barfield's coverage, informed Dr. Chamblee of her upcoming doctor's appointment on October 29, 2020, and submitted a leave form for a half-day on October 29, 2020 to attend her doctor's appointment.

37. Dr. Chamblee later called Ms. Simmons regarding her leave on October 29, 2020, and informed Ms. Simmons she needed to attend professional development on October 29 and 30, 2020. Concerned Dr. Chamblee would take disciplinary action against her for taking leave, Ms. Simmons rescheduled her appointment to February 1, 2021.

38. On or around November 30, 2020, Ms. Simmons timely submitted a leave form for December 7-8, 2020 to attend doctors' appointments.

39. After submitting these leave forms, Ms. Simmons received a phone call from Dr. Chamblee inappropriately inquiring about the purpose for Ms. Simmons' leave. Although not required to do so, Ms. Simmons explained again to Dr. Chamblee the leave was to attend two doctors' appointments. Ms. Simmons felt Dr. Chamblee was upset and harassing her for taking off days.

40. Sometime in early January 2021, Ms. Simmons timely completed a leave form for January 29, 2021 to attend a doctor's appointment that she provided to her administrative assistant to submit with the January 15, 2021, payroll.

41. On January 12, 2021, Dr. Chamblee's assistant Patricia Harris emailed all NCS' principals to inquire if there were any conflicts if Dr. Chamblee rescheduled the monthly "Principals' Meeting" to January 29, 2021. Ms. Simmons replied that she had a previously scheduled doctor's appointment on January 29, 2021.

42. Dr. Chamblee then responded to all the principals informing them the meeting would now be rescheduled for February 10, 2021, and "there should not be any non-disclosed appointments or you will change the appointment."

43. Based on Dr. Chamblee's email, Ms. Simmons retrieved the leave form from her administrative assistant and rescheduled her doctor's appointment for February 1, 2021. Ms. Simmons inferred she would be disciplined if she scheduled any future doctor appointments during school hours, regardless of whether she took sick leave to attend the appointments.

44. On January 15, 2021, one of Ms. Simmons's teachers, Ms. Virginia Garner, received an inconclusive COVID-19 test, was subsequently quarantined, so the children in her class were provided paperwork packets to ensure ongoing instruction.

45. On January 19, 2021, a teacher workday, Ms. Simmons learned Ms. Garner would be absent for the next two (2) days due to the loss of a family member. The next day, January 20, 2021, Ms. Simmons met with her administrative team to discuss coverage for Ms. Garner's class.

46. On January 20, 2021, Ms. Simmons sent a SeeSaw message to all parents in Ms. Garner's class that Ms. Garner would be out for the rest of the week until January 22, 2021, and students should use the time to complete the paperwork packets or online assignments.

47.     On January 21, 2021, Ms. Simmons filled out leave paperwork for medical appointments on February 1, 2021, and February 2, 2021, and timely submitted the paperwork to Dr. Chamblee for approval.

48.     On Monday, January 25, 2021, Ms. Garner informed Ms. Simmons she had tested positive for COVID-19. Ms. Simmons immediately contacted Dr. Edwards, the Assistant Superintendent of Human Resources, to inform him of Ms. Garner's positive test.

49.     Ms. Simmons then had a call with Ms. Pamela Miles, the school instructional coach, about coverage for Ms. Garner's classroom and to discuss getting packets for Ms. Garner's class sent out to students via bus on Thursday, January 28, 2021, the designated drop off day.

50.     On January 27, 2021, Ms. Simmons had her weekly scheduled Zoom meeting with Ms. Miles and Mr. Fagbeyiro, GES Assistant Principal, to discuss the upcoming administrative duties for the following week. During the meeting, they discussed the situation in Ms. Garner's class again and the plan to provide paperwork packets to all students.

51.     Prior to leaving school that day, Ms. Simmons placed the prepared paperwork packets on her desk for distribution on Thursday, January 28, 2021.

52.     On January 28, 2021, NCS had an inclement weather day, so the busses did not run. The prepared paperwork packets for Ms. Garner's class remained on Ms. Simmons's desk ready for distribution when the busses were able to run again.

53.　Later that day, Ms. Simmons received a call from her colleague, Ms. Lassiter, who informed Ms. Simmons that, during a meeting with another NCS's administrator, Dr. Chamblee made disparaging remarks about Ms. Simmons. Ms. Lassiter warned Ms. Simmons to be careful.

54.　As Dr. Chamblee had promoted Ms. Simmons to GES Principal, the only reason Ms. Simmons could identify for Dr. Chamblee to make negative remarks was based on her doctor's appointment conflicting with the original date of the rescheduled Principals' Meeting and Ms. Simmons taking sick leave for a half day after being diagnosed with COVID.

55.　Later in the evening, Ms. Simmons began experiencing severe chest pains and went to the Duke University emergency room where she was admitted for treatment as the doctors were concerned she was having a pulmonary embolism. After receiving X-rays, CT scans, and bloodwork, Ms. Simmons was diagnosed as having a panic attack.

56.　The morning of Friday, January 29, 2021, Ms. Simmons emailed her GES administrative team, Ms. Miles and Mr. Fagberyiro, Dr. Chamblee, and Dr. Kelvin Edwards, Assistant Superintendent of Human Resources & Public Information Officer, informing them she had been hospitalized the night prior. She requested either Ms. Miles or Mr. Fagberyiro attend a previously scheduled Zoom meeting with East Carolina University regarding its program to support new NCS's teachers.

Case 2:21-cv-00050-M   Document 1   Filed 12/22/21   Page 11 of 31

57. Ms. Simmons had emailed everyone immediately upon her discharge and return home. Yet, Dr. Chamblee maliciously responded to Ms. Simmons's email regarding her hospitalization and informed Ms. Simmons she should have notified everyone sooner about her medical emergency.

58. Later that same day, knowing Ms. Simmons had just been released from the hospital, Dr. Edwards emailed Ms. Simmons requesting to schedule a Zoom meeting for February 1, 2021, to "discuss protocols of shared leadership and not missing deadlines as a team." Ms. Simmons responded she was not available on February 1st or 2nd due to doctor's appointments but would be available on February 3, 2021.

59. According to internal NCS documentation, Dr. Chamblee appointed Mr. Niles as interim principal of Gaston Elementary School on February 1, 2021. Ms. Simmons was never informed of this decision.

60. On Monday, February 2, 2021, Ms. Simmons' doctor officially diagnosed her with anxiety and placed her on anxiety medication. Her doctor also informed Ms. Simmons her lymph nodes were swollen, and Ms. Simmons's lupus and fibromyalgia were flared up due to her work stress and subsequent anxiety and depression.

61. The interference with Ms. Simmons's medical treatment and fear of retaliation by the Board, Dr. Chamblee, and other agents of the Board for seeking medical treatment exacerbated Ms. Simmons's depression and anxiety necessitating her taking medical leave.

62. Upon her doctor's recommendation, Ms. Simmons took FMLA to address her physical symptoms of her now exacerbated illnesses and her new mental health conditions.

63. Ms. Simmons was unable to provide earlier notice of her need for emergency medical leave to the NCS as her increased symptoms and doctor's recommendation were unexpected.

64. Later in the day on February 2, 2021, Ms. Simmons emailed Dr. Chamblee and Dr. Edwards to inform them of her emergency medical leave starting February 3, 2021.

65. Dr. Chamblee informed Ms. Simmons that she (Dr. Chamblee) would make plans for the faculty and students of Gaston Elementary in her absence; however, Dr. Chamblee's assurances were false. Ms. Simmons relied on Dr. Chamblee's statement and assumed Dr. Chamblee was fulfilling all the responsibilities and duties as Principal or had assigned someone to act as interim Principal during Ms. Simmons's leave.

66. Based on Dr. Chamblee's previous messages and negative remarks to other administrators about Ms. Simmons, Ms. Simmons was terrified to submit her FMLA paperwork for the diagnoses of anxiety and depression due to the possibility of being dismissed from her job. Therefore, Ms. Simmons' rheumatologist completed her FMLA paperwork listing her non-mental health diagnoses lupus and fibromyalgia that were severely flared due to the work

stress, anxiety, and depression. The rheumatologist faxed over Ms. Simmons's FMLA paperwork to NCS on February 5, 2021.

67.    On February 8, 2021, Ms. Simmons received an email from Ms. Martin, the NCS Finance-Payroll Specialist, requesting documentation for her sick leave days. Ms. Simmons responded that this information had been faxed over to NCS on February 5, 2021. Ms. Simmons also emailed Mr. Mark Long, NCS Human Resources staff, to ensure her FMLA paperwork had been received. When Mr. Long informed Ms. Simmons the FMLA paperwork had not been received, Ms. Simmons asked her doctor to resend the information.

68.    On February 9, 2021, Ms. Simmons received another email from Ms. Martin informing Ms. Simmons her pay would be adjusted due to not receiving documentation for the days after Ms. Simmons's fifth (5th) absence. Ms. Simmons emailed Ms. Martin her hospital discharge paperwork from January 29, 2021, and the approved leave form signed by Dr. Chamblee for February 1-2, 2021. Ms. Simmons also explained that her FMLA started on February 3, 2021.

69.    On February 10, 2021, Mr. Long informed Ms. Simmons he had still not received her FMLA paperwork. Ms. Simmons was about to drive to her doctor's office to pick up the paperwork when the nurse suggested uploading the forms while she was on the phone with her to ensure Ms. Simmons was able to access it. Ms. Simmons downloaded the FMLA documentation from her chart and sent it to NCS herself.

70. On February 11, 2021, although she was on FMLA, Ms. Simmons received an email from Dr. Edwards informing Ms. Simmons he wanted to discuss a situation that occurred prior to her taking leave.

71. On February 12, 2021, Ms. Simmons called Dr. Edwards to discuss his email, but he did not pick up the phone. Ms. Simmons then emailed him.

72. Shortly after, Dr. Edwards called Ms. Simmons and informed her parents of Gaston Elementary School had called NCS and alleged their children had no teacher. Dr. Edwards then began questioning Ms. Simmons about Ms. Garner's absence and class coverage. This call caused Ms. Simmons to have another minor panic attack including chest pains.

73. Prior to this call, Ms. Simmons had not received any complaints from parents regarding the instruction provided to their children.

74. On February 12, 2021, Ms. Simmons received a call informing her Dr. Chamblee, Dr. Edwards, Mr. Niles, the interim principal for Gaston Elementary School, and Mr. Mark Barfield, Director of Student Services & Public Affairs, called a staff meeting and told the staff about the staffing issue in Ms. Garner's kindergarten class and the future plans for the school in Ms. Simmons's absence.

75. For the first time, Ms. Simmons learned her Assistant Principal, Mr. Fagbeyiro, had been removed from Gaston Elementary and reassigned shortly after Ms. Simmons went on leave.

76. On February 16, 2021, Ms. Simmons received an email about submitting her intent to return as Principal in the following school year. Ms. Simmons completed the intent form stating she planned to return to NCS and submitted it.

77. On February 19, 2021, Ms. Simmons received a call from Dr. Edwards informing Ms. Simmons she was required to call him by the end of the business day. Dr. Edwards also sent an email to Ms. Simmons informing her she needed to call him prior to 5:00 PM. Ms. Simmons called Dr. Edwards who informed her that she was being investigated for possible dismissal based on the following allegations:

    a. Failing to provide instruction in the kindergarten classroom while the teacher was out.

    b. Failure to re-assign the kindergarten teacher assistant back to kindergarten while the teacher was out.

78. Ms. Simmons was informed she would be required to attend a meeting, while out on FMLA, with Dr. Edwards and Dr. Chamblee on February 23, 2021, to discuss the allegations.

79. On February 20, 2021, Ms. Simmons received an email with a "Summary of Grounds for Dismissal" letter. She was also informed she would now be meeting with Dr. Chamblee, Dr. Edwards, and an attorney for the school board (Colin Shive of Tharrington Smith) to discuss the summary letter. The letter

did not advise Ms. Simmons she could bring her own representation if she desired.

80. The letter stated:

> At the conclusion of the meeting [on February 24, 2021], I [Dr Chamblee] will decide whether to place you on suspension without pay immediately, pursuant to N.C. Gen. Stat. § 115C-325.5, because I believe that cause exists for dismissing you from your position as a school administrator.

81. The letter included inaccurate information, and it provided Ms. Simmons no information regarding what, if any, investigation had occurred or who had made the allegations.

82. The letter also stated, "these concerns are in addition to your overall failed leadership at Gaston Elementary School" but failed to outline what the basis was for characterizing Ms. Simmons's performance as Principal as "overall failed leadership."

83. Prior to February 20, 2021, Ms. Simmons had received no communication from Ms. Garner, other Gaston Elementary School staff, parents, Dr. Edwards, Dr. Chamblee, or other NCS staff regarding concerns about class coverage.

84. Ms. Simmons was shocked by these allegations as she had taken multiple affirmative steps including but not limited to communicating with parents, sending out weekly instructional packets, coordinating with social workers to check on absent students, and meeting with her administrative team to ensure Ms. Garner's students were receiving instruction in line with Board guidance.

85. Moreover, Ms. Simmons was shocked by the allegations since Dr. Chamblee had assured Ms. Simmons that she (Dr. Chamblee) would personally ensure all administrative duties were fulfilled at Gaston Elementary during Ms. Simmons's leave.

86. NCS's attempt to terminate Ms. Simmons while she was on medical leave interfered with her leave and ability to address her medical concerns.

87. NCS's attempt to terminate Ms. Simmons was based on Ms. Simmons's disability.

88. NCS's attempt to terminate Ms. Simmons was in retaliation for her taking of her statutory right to take medical leave.

89. NCS's attempt to terminate Ms. Simmons was also in retaliation for her request for a reasonable accommodation under the ADA.

90. NCS's reason for recommending Ms. Simmons for termination was a pretext for its discrimination against her due to her disability and retaliation against her for taking medical leave.

91. After hiring representation, Ms. Simmons received no further communication from NCS about any ongoing investigation regarding the allegations of lack of class coverage.

92. On April 29, 2021, Ms. Simmons FMLA expired, and she requested the NCS extend her leave in order to allow her more time to receive ongoing medical treatment. On May 5, 2021, Mr. Long responded that Ms. Simmons request for an extension was denied.

93. On May 13, 2021, Ms. Simmons received a letter from Dr. Chamblee dated May 12, 2021, informing Ms. Simmons she was being transferred to the role of a third (3rd) grade teacher at Willis Hare Elementary School.

94. Willis Hare Elementary School is on the opposite side of the county from Gaston Elementary School. In addition, Willis Hare Elementary School had one (1) third (3rd) grade classroom that was already staffed with a certified teacher at the time of Ms. Simmons's transfer.

95. Dr. Chamblee informed Ms. Simmons this transfer was due to the allegations that Ms. Simmons did not get proper coverage for Ms. Garner's classroom. The letter stated the coverage failure was from January 19, 2021, until February 9, 2021, although Ms. Simmons had been on leave since January 29, 2021.

96. The new letter, again without any basis or identified deficiency, alleged "overall failed leadership" by Ms. Simmons but failed to provide any context or basis for this accusation.

97. Ms. Simmons's transfer from the administrative role of principal to a classroom teacher was discriminatory, and in retaliation for taking medical leave to seek treatment for her diagnosed conditions.

98. On May 19, 2021, Ms. Simmons submitted a rebuttal letter to Dr. Chamblee's letter of demotion.

99. On May 27, 2021, Ms. Simmons filed complaints with the Equal Employment Opportunity Commission (EEOC) and Department of Labor (DOL). Ms. Simmons alleged the Board and Dr. Chamblee had discriminated against her

on the basis of her disabilities prior to taking medical leave and had interfered with, discriminated and retaliated against Ms. Simmons based on her disability and for taking medical leave under the FMLA.

100. On July 6, 2021, the Board's counsel informed Ms. Simmons's counsel the Board had received her EEOC complaint.

101. On July 8, 2021, the Board's counsel informed Ms. Simmons's counsel the Board was declining to participate in EEOC mediation.

102. On July 21, 2021, Ms. Simmons emailed the Board directly asking:

    a) Did each of you receive copies of my complaints to both the EEOC and DOL?

    b) Did the Board vote to decline the EEOC's offer to hold a mediation between the Board and myself? (I have not been able to confirm this from reviewing any publicly available Board minutes.)

103. The Board did not timely respond.

104. On August 4, 2021, Ms. Simmons resigned her position from the NCS.

105. On September 27, 2021, the Board issued a letter in response to Ms. Simmons's July 21, 2021, email. The Board Chair, Ms. Rhonda Taylor, informed Ms. Simmons the Board was "not aware of your request for mediation until we received your email. When we asked the Board's attorney about the request for mediation we were told the decision regarding whether the school system should participate in mediation is historically made by the Superintendent, and that is what occurred in this matter."

106. Based on the Board Chair's letter, Dr. Chamblee again retaliated against Ms. Simmons by concealing from the Board her request for mediation and interfered with Ms. Simmons's ability to resolve her complaint outside of filing a lawsuit.

107. While Local Boards of Education may participate in the North Carolina School Board Trust (hereinafter " NCSBT") without waiving governmental immunity, to the extent a Local Board of Education has additional insurance, including excess insurance, that constitutes a waiver of governmental immunity. Advisory Opinion; Authority of Local Boards of Educations to Participate in Risk Management Pools; Chapter 160A, Article 20; G.S. §§ 115C-42 and 43 (2002).

108. Upon information and belief, Northampton County Schools holds additional excess insurance policies that would cause a waiver of governmental immunity.

109. Upon information and belief, the Board is Reinsured and has excess liability insurance for General Liability and Errors and Omissions, including coverage for civil rights and negligence claims, through the Great American Insurance Company indemnifying the Board or its employees and waiving governmental immunity.

110. Upon information and belief, Northampton County Schools' excess liability insurance covers the actions of its Superintendent.

## CLAIMS FOR RELIEF

## COUNT I

**Discrimination and Failure to Accommodate Based on Disability in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.**

**(Defendant Board and Dr. Chamblee, in her official capacity)**

111. Plaintiff incorporates all preceding paragraphs into this Count by reference as if fully stated herein.

112. Plaintiff is a "qualified individual with a disability," as defined by the ADA, 42 U.S.C. § 12131(2).

113. The Board is a "public entity" within the meaning of the ADA. 42 U.S.C. § 12131(1).

114. Title II of the ADA states "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132.

115. "Requesting a reasonable accommodation is a 'protected activity' under the ADA, 42 U.S.C. 12112(b)(5), and medical leave can be a reasonable accommodation, particularly where "it is finite and will be reasonably likely to enable the employee to return to work," *Hopkins v. MWR Mgmt. Co.*, No. 15 CVS 697, 2017 WL 2380227, at *7 (N.C. Super. May 31, 2017) (citing *Kitchen v. Summers Continuous Care Ctr.*, LLC, 552 F. Supp. 2d 589, 596 (S.D.W. Va.

2008)).

116. The Board discriminated against Plaintiff by taking adverse employment action against her while she was on medical leave, which was motivated by her disability, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12132.

117. Defendant Board failed to reasonably accommodate Plaintiff by allowing her medical leave without interference and the ability to attend medical appointments, using earned sick leave, without repercussions.

118. As a direct and proximate result of Defendant's discrimination based on Plaintiff's disability, Plaintiff sustained, and continue to sustain, damages in excess of FIFTY THOUSAND DOLLARS ($50,000.00), the amount to be determined at trial. Plaintiff's damages include, but are not limited to:

   a) Past, present and future psychological pain, suffering, and impairment; and

   b) Medical bills, counseling, and other costs and expenses for future psychological care; and

   c) Attorneys' fees.

# COUNT II

**Retaliation Based on Disability in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.**

**(Defendant Board and Dr. Chamblee, in her official capacity)**

119. Ms. Simmons incorporates all preceding paragraphs into this Count by reference as if fully stated herein.

120. To demonstrate a retaliation claim under the ADA, a Plaintiff must demonstrate "(1) that [she] engaged in protected conduct, (2) that [she] suffered an adverse action, and (3) that a causal link exists between the protected conduct and the adverse action." *Hopkins*, 2017 WL 2380227, at *8 (citing *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011)).

121. Ms. Simmons engaged in protected conduct when she requested a reasonable accommodation in the form of medical leave.

122. The Board retaliated against Ms. Simmons for taking medical leave by recommending her for termination without good cause less than three (3) weeks after she took leave.

123. Defendant Board's main reason for recommending Ms. Simmons for termination was due to her disability and taking of medical leave.

124. As a direct and proximate result of Defendant's retaliation, Plaintiff sustained, and continue to sustain, damages in excess of FIFTY THOUSAND DOLLARS ($50,000.00), the amount to be determined at trial. Plaintiff's damages include, but are not limited to:

a) Past, present and future psychological pain, suffering, and impairment; and

b) Medical bills, counseling, and other costs and expenses for future psychological care; and

c) Attorneys' fees.

## COUNT III

### Interference with the Family and Medical Leave Act ("FMLA"), 29 U.S.C. 2601, et seq.

### (Defendant Board and Dr. Chamblee, in her official capacity)

125. Ms. Simmons incorporates all preceding paragraphs into this Count by reference as if fully stated herein.

126. Under the FMLA, an employee "shall be entitled to a total of 12 workweeks of leave during any 12-month period for...a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. 2601(A)(1)(D).

127. "Employers may not 'interfere with, restrain, or deny the exercise of' an employee's FMLA rights, 29 U.S.C. § 2615(a)(1), nor may employers 'discharge or in any other manner discriminate against' employees asserting FMLA rights, 29 U.S.C. § 2615(a). *Hopkins*, 2017 WL 2380227, at *10.

128. Dr. Chamblee, as an agent of the Board, discouraged Ms. Simmons from taking leave for medical appointments.

129. Dr. Chamblee and the Board interfered with Ms. Simmons's rights under FMLA by requiring her to work during her medical leave.

130. Dr. Chamblee and the Board interfered with Ms. Simmons's rights under FMLA by initiating termination proceedings against her while she was out on FMLA.

131. As a direct and proximate result of Defendants' interference, Plaintiff sustained, and continue to sustain, damages in excess of FIFTY THOUSAND DOLLARS ($50,000.00), the amount to be determined at trial. Plaintiff's damages include, but are not limited to:

   a) Past, present and future psychological pain, suffering, and impairment; and

   b) Medical bills, counseling, and other costs and expenses for future psychological care; and

   c) Attorneys' fees.

## **COUNT IV**

**Retaliation in Violation of with the Family and Medical Leave Act ("FMLA"), 29 U.S.C. 2601, et seq.**

**(Defendant Board and Dr. Chamblee, in her official capacity)**

132. Ms. Simmons incorporates all preceding paragraphs into this Count by reference as if fully stated herein.

133. "A *prima facie* case for FMLA retaliation requires the same elements as a prima facie case for ADA retaliation." *Hopkins*, 2017 WL 2380227, at *10

(citing *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 429 (4th Cir. 2015)).

134.   Dr. Chamblee and Defendant Board retaliated against Ms. Simmons by initiating termination proceedings against her while she was out on FMLA.

135.   As a direct and proximate result of Defendants' retaliation, Plaintiff sustained, and continue to sustain, damages in excess of FIFTY THOUSAND DOLLARS ($50,000.00), the amount to be determined at trial.   Plaintiff's damages include, but are not limited to:

   a)  Past, present and future psychological pain, suffering, and impairment; and

   b)  Medical bills, counseling, and other costs and expenses for future psychological care; and

   c)  Attorneys' fees.

## COUNT V

### Negligent Infliction of Emotional Distress

### (Dr. Chamblee, in her individual capacity)

136.   Ms. Simmons incorporates all preceding paragraphs into this Count by reference as if fully stated herein.

137.   A defendant is liable for negligent infliction of emotional distress when "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress . . . , and (3) the conduct did in fact cause the plaintiff severe emotional distress." *Acosta*

*v. Byrum*, 180 N.C. App. 562, 667 (2006) (*quoting R. Johnson v. Ruark Obstetrics*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990)).

138. Dr. Chamblee knew of Ms. Simmons's right to be free from discrimination and retaliation under the ADA, and her right to take protected medical leave without interference and retaliation.

139. Dr. Chamblee purposefully discriminated against Ms. Simmons's on the basis of her disability and retaliated against Ms. Simmons for taking medical leave by taking unfounded, disciplinary action against Ms. Simmons and recommending her dismissal.

140. Dr. Chamblee maliciously discriminated and retaliated against Ms. Simmons with the intent to injure her. A reasonable superintendent would not have acted in such a manner against one of her employees.

141. Dr. Chamblee negligently engaged in conduct that was reasonably foreseeable to cause Ms. Simmons severe emotional distress and did, in fact, cause Ms. Simmons severe emotional distress when she made negative comments regarding Ms. Simmons's medical appointments to other NCS employees, publicly chastised Ms. Simmons's for making medical appointments, commenced termination proceedings against Ms. Simmons while she was on FMLA, and prevented the Board from engaging in mediation with Ms. Simmons.

142. Dr. Chamblee failed to follow that degree of care that a reasonable and prudent person would use under the same or similar circumstances.

143. Ms. Simmons suffered severe emotional distress as a result of Dr. Chamblee's failures including, but not limited to:

    a) Increased anxiety;

    b) A medical diagnosis of anxiety;

    c) Panic attacks; and

    d) Requiring medical leave to address her deteriorated mental health as a result of Defendants' actions.

144. Dr. Chamblee's negligence was a proximate cause of Ms. Simmons's severe emotional distress, which Dr. Chamblee should have foreseen as the natural and continuous sequence of her negligent actions.

145. As a direct and proximate result of Dr. Chamblee's negligent infliction of emotional distress Ms. Simmons sustained, and continues to sustain, damages in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00), the amount to be determined at trial. Ms. Simmons's damages include, but are not limited to:

    a) Punitive damages;

    b) Past, present and future psychological pain, suffering, and impairment; and

    c) Medical bills, counseling, and other costs and expenses for future psychological care.

## PRAYER FOR RELIEF

**NOW THEREFORE**, Ms. Simmons respectfully requests that judgment be entered in her favor and the Court order the following the relief:

146. This Court issue a declaratory judgment that the Board has violated Plaintiff's rights under the ADA, FMLA, and North Carolina state law;

147. This Court award permanent injunctive relief including, but not limited to, ordering the Board to cease its policy, practice, and custom of allowing the Superintendent to interfere with and retaliate against employees based on their disabilities or for engaging in the protected activity of taking FMLA.

148. This Court award equitable relief including, but not limited to ordering the Board and all NCS's administrators to receive training on the ADA and FMLA.

149. This Court award Ms. Simmons compensatory damages from the Board, and Dr. Chamblee, in her individual capacity, for Ms. Simmons's psychological and emotional distress;

150. This Court award Ms. Simmons punitive damages from the Board and Dr. Chamblee, in her individual capacity, to deter others from like conduct;

151. This Court award Ms. Simmons nominal damages in the amount of one dollar from the Board;

152. This Court order the Board to reimburse Ms. Simmons all costs incurred in litigating this matter including, but not limited to, expert witness fees, depositions, and court costs;

153. This Court award Ms. Simmons all attorneys' fees incurred in litigating her claims under the ADA and the FMLA pursuant to the fee-shifting provisions in each act; and

154. This Court award any other relief this Court deems just and proper.

Respectfully submitted, this the 22nd day of December, 2021.

/s/ Stacey M. Gahagan
Stacey M. Gahagan
N.C. State Bar No. 44393
3326 Durham Chapel Hill Blvd., #210-C
Durham, NC 27707
Telephone: (919) 942-1430
Email: sgahagan@ncgplaw.com
*COUNSEL FOR PLAINTIFF*